The summaries of the Colorado Court of Appeals published opinions
constitute no part of the opinion of the division but have been prepared by
the division for the convenience of the reader. The summaries may not be
cited or relied upon as they are not the official language of the division.
Any discrepancy between the language in the summary and in the opinion
should be resolved in favor of the language in the opinion.

SUMMARY
November 14, 2019

**2019COA170**

**No. 18CA1744, *Duke v. Gunnison County* — Torts — Wrongful
Death; Colorado Governmental Immunity Act — Immunity and
Partial Waiver**

A division of the court of appeals considers whether the

Colorado Governmental Immunity Act (CGIA) bars a wrongful death

action by parents of a deceased inmate against a public entity — a

jail. The division concludes that the waiver of immunity for

operation of a jail does not apply to the parents' suit because (1) the

inmate was excluded from the waiver, having been incarcerated

pursuant to a conviction at the time of his injury, *see*

§ 24-10-106(1.5)(a), C.R.S. 2019; and (2) a party is liable in a

wrongful death action only when the injured party could have

"maintain[ed] an action and recover[ed] damages . . . if death had

not ensued," § 13-21-202, C.R.S. 2019. Relying on *Sigman v.*

*Seafood Ltd. Partnership I,* 817 P.2d 527, 530-31 (Colo. 1991), the

division holds that when a decedent could not have maintained an action for his injury, the tortfeasor is not liable to the decedent's heirs.

The division also considers whether a public employee must have knowledge of a specific danger to another for his or her conscious disregard of that danger to constitute willful and wanton conduct excepting the employee from CGIA immunity. *See* § 24-10-118(2)(a), C.R.S. 2019; *see also Martinez v. Estate of Bleck*, 2016 CO 58, ¶¶ 30, 32. The division concludes that knowledge of a health danger to another, and conscious disregard thereof, may be sufficient to render conduct willful and wanton for purposes of the CGIA.

COLORADO COURT OF APPEALS                    **2019COA170**

Court of Appeals No. 18CA1744
Gunnison County District Court No. 18CV30013
Honorable J. Steven Patrick, Judge

Beth Ann Duke and Joseph Councell Duke, Jr.,

Plaintiffs-Appellants,

v.

Gunnison County Sheriff's Office, Richard Besecker, Ian Clark, Ryan Phillips,
Paula Martinez, Conner Udell, Megan Hollenbeck, Chad Roberts, and Brandyn
Rupp,

Defendants-Appellees.

ORDER AFFIRMED IN PART, REVERSED IN PART,
AND CASE REMANDED WITH DIRECTIONS

Division II
Opinion by JUDGE RICHMAN
Dailey and Brown, JJ., concur

Prior Opinion Announced October 3, 2019, <u>WITHDRAWN</u>

OPINION PREVIOUSLY ANNOUNCED AS "NOT PUBLISHED
PURSUANT TO C.A.R. 35(e)" ON OCTOBER 3, 2019, IS
NOW DESIGNATED FOR PUBLICATION

Announced November 14, 2019

Levin Sitcoff PC, Bradley A. Levin, Elisabeth L. Owen, Denver, Colorado, for
Plaintiffs-Appellants

Berg Hill Greenleaf Ruscitti LLP, Josh A. Marks, David J. Goldfarb, Boulder,
Colorado, for Defendants-Appellees Gunnison County Sheriff's Office, Richard
Besecker, Ian Clark, and Ryan Phillips

Williams, Turner & Holmes, P.C., Jeffrey L. Driscoll, Grand Junction, Colorado, for Defendants-Appellees Paula Martinez, Conner Udell, Megan Hollenbeck, Chad Roberts, and Brandyn Rupp

¶ 1     Plaintiffs, Beth Ann Duke and Joseph Councell Duke, Jr.,

appeal an order granting motions to dismiss a claim for the

wrongful death of their son, Joseph C. "Trey" Duke III, for lack of

subject matter jurisdiction over defendants, Gunnison County

Sheriff's Office (GCSO), Sheriff Richard Besecker, and Deputies Ian

Clark, Paula Martinez, Conner Udell, Megan Hollenbeck, Chad

Roberts, Brandyn Rupp, and Ryan Phillips.  We affirm in part and

reverse in part.

## I. Background

¶ 2     Although the district court did not hold a hearing pursuant to

*Trinity Broadcasting of Denver, Inc. v. City of Westminster*, 848 P.2d

916 (Colo. 1993), the following facts, taken in part from the record

in a related federal case, as relevant here, are undisputed.  Trey had

a long history of substance abuse, and he had been arrested and

incarcerated in Gunnison multiple times for drug and alcohol

related offenses.  In the afternoon of June 27, 2015, when Trey was

twenty-five years old, Deputy Clark found him passed out on pallets

outside a motel and wearing an ankle monitor.  A search and field

test revealed that a material Trey was carrying in a pill bottle was

heroin.  Clark arrested Trey for possession of heroin, in violation of

his parole, and for use of alcohol or controlled substances, in violation of a protection order.  Deputy Martinez transported Trey to the Gunnison County Jail.  Deputy Phillips was on duty when Trey arrived, at approximately 3:45 p.m.

¶ 3    Though Trey's behavior and appearance indicated that he was under the influence of controlled substances, he denied ingesting any drugs other than Clonazepam, as prescribed.  He was given a drug recognition examination (DRE), and the evaluator opined that Trey was under the influence of a polydrug combination of a stimulant and a narcotic analgesic.  The DRE was not definitive because it did not include a blood test.

¶ 4    Deputy Udell placed Trey on a sixteen-hour drug hold in the jail, where he would be checked periodically by deputies on duty.  After a check, the deputy would mark the time, comments, and initials on a time check sheet (TCS).

¶ 5    Trey turned out his pockets and Udell conducted a partial "hands-on pat-down search" before placing Trey in a padded cell with a camera.  At some point before 10:00 p.m., Deputy Hollenbeck saw on the video feed that Trey had removed something

2

from the front of his pants, and she sent Udell to retrieve the item. Udell reported, "it's just some foil."

¶ 6    At about 8:05 p.m., and again at about 10:40 p.m., Trey made telephone calls to his girlfriend and his mother — plaintiff Beth Ann Duke.  At approximately 10:55 p.m., he was moved to a different cell without a video camera.  According to the TCS, deputies checked on Trey fifteen times during the night, between the time he was placed in the new cell and the time he was served breakfast at approximately 7:30 a.m.  Plaintiffs allege that the video surveillance in the corridor outside Trey's cell does not corroborate some of the TCS entries.

¶ 7    Deputy Roberts served Trey's breakfast.  Roberts reported that when he went to collect the tray shortly before 8:00, he saw Trey "sitting [on the cell floor] with his legs crossed hunched over eating."  When Roberts asked, Trey said that he was ok.

¶ 8    An "inmate trustee," Brandon Morse, was cleaning the area outside Trey's cell when Deputy Phillips went to collect Trey's breakfast tray, sometime between 8:30 and 8:50.  The trustee and deputy were each familiar with Trey from prior contacts.  Both men

saw Trey sitting cross-legged in his cell, with his head resting on the floor in front of his legs.

¶ 9     The accounts of Morse and Phillips diverge at this point. Morse said he had never seen anyone sit like that before, but Phillips said he had seen Trey in that position before. Morse said he saw the breakfast tray on the floor of the cell and food "splattered all over the floor," but Phillips said he was able to retrieve the breakfast tray from the cell door. (A review of the security video confirms that Phillips retrieved the tray from the cell door.) Morse said he saw Phillips "glance" at Trey. Phillips stated that he "observed [him] to be breathing, based on the rise and fall of his back." Morse reported that he told Phillips he "didn't think Trey looked so good," and he said Phillips responded, "That's what you get for doing drugs." Phillips said he didn't recall speaking with Morse, but he admitted that the video showed them having an interaction.

¶ 10    Approximately thirty minutes later, Deputy Rupp noticed Trey sitting in the same position reported by Deputy Phillips, with a small amount of bile coming from his mouth. He tried to wake him but found him to be unresponsive. Rupp called for emergency

4

services and began lifesaving measures, but his efforts were to no avail. An emergency medical services team declared Trey dead shortly thereafter.

¶ 11     A final autopsy reported a "disrupted open plastic baggy," ethanol, opiates, and high levels of fentanyl in Trey's stomach; naloxone, clonazepam, oxycodone, fentanyl, cyclobenzaprine, and norfentanyl presence in his blood; and opiates, cocaine, benzodiazepines, and oxycodone presence in his urine. The examiner attributed the cause of death to a polydrug overdose, with fentanyl as the major component.

¶ 12     Plaintiffs filed a federal suit, claiming (1) a violation of Trey's constitutional rights for deliberate indifference to a serious medical threat, under 42 U.S.C. § 1983 (2018); and (2) wrongful death, under section 13-21-202, C.R.S. 2019. The federal court granted summary judgment in favor of defendants on the federal claim, concluding that no clearly established constitutional right had been violated, and the GCSO had not been deliberately indifferent to injuries that could result from failure to train its staff on signs of an overdose. The court declined to exercise supplemental jurisdiction over the state law claim.

¶ 13 Plaintiffs refiled the state claim in district court. They argued that defendants breached a duty to prevent Trey's death when each defendant failed to obtain professional medical treatment before or during his confinement and that Deputy Udell and the GCSO failed to properly search Trey. They also argued that sovereign immunity is waived pursuant to sections 24-10-105(1) and -106(1)(b), C.R.S. 2019.

¶ 14 Defendants moved to dismiss, in two separate motions, arguing that they were immune from the claim because it sounds in tort and does not fall within any waiver of immunity under the Colorado Governmental Immunity Act (CGIA). Specifically, the GCSO argued that the waiver of immunity for operation of a jail does not apply because Trey was incarcerated pursuant to a conviction, *see* § 24-10-106(1.5)(a), and the Sheriff and individual deputies argued that the waiver of immunity does not apply because their conduct was not willful and wanton, *see* § 24-10-118(2), C.R.S. 2019. Defendants Clark and Phillips specifically argued that they could not have consciously disregarded the danger of an overdose because they did not know that Trey had ingested fentanyl.

¶ 15     Plaintiffs argued that governmental immunity was waived because (1) they, not Trey, were the claimants for the lawsuit, and they were not incarcerated; and (2) the individual defendants willfully and wantonly failed to provide Trey with needed medical attention, failed to thoroughly search his person, and fabricated records.

¶ 16     The district court granted the motions to dismiss, concluding that it lacked subject matter jurisdiction to hear the case. The court relied on the evidence from discovery in the federal case and did not hold an evidentiary hearing. First, the court found that the GCSO is immune from liability because Trey was undisputedly a convicted inmate who was incarcerated for a crime at the time of his death, the GCSO is immune from tort claims by convicted inmates, and wrongful death claims are wholly derivative of and dependent upon the claims that the decedent would have had. Second, relying on an assumption that Trey had swallowed a baggie containing a fentanyl patch, and defining "known risk" as the specific knowledge that Trey had swallowed a fentanyl patch, the court found that none of the individual defendants had acted with conscious

disregard for a known risk, and therefore their conduct was not willful and wanton.

¶ 17    The plaintiffs appeal each of these rulings.

## II. GCSO Immunity Under the CGIA

¶ 18    Plaintiffs argue that because they are not convicted inmates, and they are the claimants, the GCSO enjoys no immunity from their wrongful death claim.  We are not persuaded.

### A. Legal Authority and Standard of Review

¶ 19    The CGIA generally provides immunity for public entities from tort claims, including wrongful death.  As relevant here, section 24-10-106 initially immunizes the public entity against a wrongful death claim but generally waives the immunity in connection with the operation of a correctional facility or jail, and then limits the waiver with respect to claimants who have been convicted of a crime and incarcerated in a jail pursuant to such conviction, specifically restoring immunity to that jail in such situations.  The statute provides, as relevant here:

> (1) A public entity shall be immune from
> liability in all claims for injury which lie in tort
> or could lie in tort regardless of whether that
> may be the type of action or the form of relief
> chosen by the claimant except as provided

8

otherwise in this section. Sovereign immunity is waived by a public entity in an action for injuries resulting from:

. . . .

(b) The operation of any . . . correctional facility, as defined in section 17-1-102, C.R.S., or jail by such public entity;

. . . .

(1.5)(a) The waiver of sovereign immunity created in paragraph[] (b) . . . of subsection (1) of this section does not apply to claimants who have been convicted of a crime and incarcerated in a correctional facility or jail pursuant to such conviction, and such correctional facility or jail shall be immune from liability as set forth in subsection (1) of this section.

*Id.*

¶ 20 Because CGIA derogates the common law, courts must strictly construe provisions that grant immunity, broadly construe the provisions that waive immunity, and strictly construe exceptions to waivers in favor of compensating victims. *See Medina v. State*, 35 P.3d 443, 453 (Colo. 2001); *see also Dempsey v. Denver Police Dep't*, 2015 COA 67, ¶ 21.

¶ 21 Section 13-21-202 (the wrongful death statute) provides:

When the death of a person is caused by a wrongful act, neglect, or default of another,

9

and the act, neglect, or default is such as would, if death had not ensued, *have entitled the party injured to maintain an action and recover damages in respect thereof*, then, and in every such case, the person who or the corporation which would have been liable, if death had not ensued, shall be liable in an action for damages notwithstanding the death of the party injured.

(Emphasis added.)

¶ 22    Where, as here, the underlying facts are undisputed and the district court decided the jurisdictional issue as a matter of law, we review de novo. *Medina*, 35 P.3d at 452.

## B. Application

¶ 23    The parties agree that Trey was a convicted inmate for purposes of the CGIA at the time of his death. Plaintiffs' argument that the GCSO (a public entity) should not be immune from their suit turns on one word in the inmate exception to the immunity waiver for operation of a jail: "claimants." However, we agree with the district court that the question of jurisdiction does not begin with a definition of the word claimants, but with an interpretation of the wrongful death statute.

¶ 24    A party is liable in a wrongful death action when the injured party could have "maintain[ed] an action and recover[ed]

10

damages . . . if death had not ensued." § 13-21-202. Colorado case law clearly establishes that the right to collect damages in a wrongful death case is "dependent upon the right of action which the decedent would have had, had []he survived [the] injuries." *Pizza Hut of Am., Inc. v. Keefe*, 900 P.2d 97, 102 (Colo. 1995); *see also Steedle v. Sereff*, 167 P.3d 135, 140 (Colo. 2007) (The right "does not arise from a separate tort, but instead is wholly derivative of the injury to the decedent.").

¶ 25    When a decedent could not have maintained an action due to a different section of the Colorado Revised Statutes, the tortfeasor is not liable to the decedent's heirs. *See Sigman v. Seafood Ltd. P'ship I*, 817 P.2d 527, 530-31 (Colo. 1991) (holding that where the decedent would have been prevented from suit under a dram shop liability statute, decedent's heirs were precluded from bringing a wrongful death action). As in *Sigman*, the plaintiffs in this case can maintain an action only if Trey could have done so had his injuries not been fatal. Just as the dram shop provisions barred the decedent's claims in *Sigman*, and thus the claims of his heirs, so too does the CGIA bar the claim of Trey's parents in this case.

¶ 26    Even granting narrow construction of the immunity provisions, and broad construction of the waiver provisions, we could not interpret section 24-10-106 to permit Trey to maintain an action for his injuries against the GCSO, had he survived his overdose.  In short, under subsections (1), (1)(b), and (1.5)(a) of section 24-10-106, an injured party cannot sue a jail for a tortious injury unless the injury (in this case death) occurred in the jail *and* the injured (or deceased) party was not a convicted inmate.  Because Trey was a convicted inmate, the GCSO was immune from suit for any injury to him, even if the injury was death.  *See* § 24-10-103(2), C.R.S. 2019 (defining "injury" under the CGIA to mean "death, injury to a person, damage . . .").  Accordingly, his parents cannot pursue a wrongful death action against the GCSO for Trey's death.

¶ 27    We affirm the portion of the district court's order dismissing the plaintiffs' claims against the GCSO, although we conclude the dismissal should be for failure to state a claim for relief under C.R.C.P. 12(b)(5).

III. Public Employee Immunity Under the CGIA

12

¶ 28    Plaintiffs contend that the district court erred in its analysis of the willful and wanton conduct of the individual defendants because it did not consider facts alleged in their complaint. We agree to a limited extent.

### A. Legal Authority and Standard of Review

¶ 29    Section 24-10-118(2)(a) provides limited sovereign immunity to public employees as follows:

> A public employee shall be immune from liability in any claim for injury, . . . which lies in tort or could lie in tort . . . and which arises out of an act or omission of such employee occurring during the performance of his duties and within the scope of his employment unless the act or omission causing such injury was willful and wanton . . . .

¶ 30    A public employee's sovereign immunity is a question of subject matter jurisdiction. As our supreme court recently made clear, all issues related to an employee's immunity, including factual issues such as whether a public employee acted in a willful and wanton manner, are to be determined by the district court prior to trial, pursuant to C.R.C.P. 12(b)(1). *Martinez v. Estate of Bleck,* 2016 CO 58, ¶ 27; *see Trinity Broad. of Denver,* 848 P.2d at 924.

¶ 31    For willful and wanton conduct to subject a public employee to liability for a tort claim, the conduct must be more than merely negligent; the conduct must exhibit a conscious disregard of the danger to another. *See Martinez,* ¶¶ 30, 32.

¶ 32    It is the plaintiff's burden to prove that a public employee has waived the right to sovereign immunity. *Gray v. Univ. of Colo. Hosp. Auth.,* 2012 COA 113, ¶ 15. However, "the burden is a relatively lenient one," as there is no presumption of sovereign immunity, and plaintiffs "should be afforded the reasonable inferences of [their] evidence." *Tidwell v. City & Cty. of Denver,* 83 P.3d 75, 85-86 (Colo. 2003). "When the alleged jurisdictional facts are in dispute, the [district] court should conduct an evidentiary hearing and enter findings of fact." *Id.* But the court may rule without a hearing when there is no evidentiary dispute. *Id.* at 86.

¶ 33    We will uphold the factual determinations of the district court unless those determinations are clearly erroneous. *Medina,* 35 P.3d at 452. However, when the court does not make findings of fact and decides jurisdictional issues as a matter of law, we review de novo. *Id.* at 452-53.

## B. Application

¶ 34    The record supports a finding that Trey died after ingesting fentanyl. The record is not clear as to when, and in what manner, Trey ingested fentanyl. However, a finding of this fact is not dispositive to our analysis.

¶ 35    Of significantly greater import is the legal standard set by the district court's interpretation that, for the individual defendants' conduct to be willful and wanton, Trey's swallowing a fentanyl patch is "the danger" that must be consciously disregarded. With respect to almost all the individual defendants, the district court stated that there was no evidence the individual defendant "knew or should have known that Trey Duke ingested a fentanyl patch with a lethal dose of fentanyl."[1] Based on that finding, the district court concluded the defendants' conduct was not willful or wanton.

¶ 36    We conclude, however, that this level of specificity places an exceedingly high burden on plaintiffs, when instead the burden should be a lenient one because we must narrowly construe

---

[1] With respect to Deputy Martinez, the court found that there is no evidence that she "had any knowledge of any of the drugs that Trey Duke had ingested, or that he was at risk of an overdose."

15

statutes that grant governmental immunity. *See Tidwell*, 83 P.3d at 85-86.

¶ 37 We are aware of no support for the proposition that a public employee's knowledge of the specific cause of potential injury or death is required for the employee's omissions to constitute willful and wanton conduct. To the contrary, knowledge and conscious disregard of a health danger to another is sufficient. *See Peterson v. Arapahoe Cty. Sheriff*, 72 P.3d 440 (Colo. 2003) (holding allegations that the defendants refused to take a beaten man, afraid of additional beatings, into custody was sufficient to plead a claim based on willful and wanton conduct); *Gray*, ¶ 41 (holding allegations that a physician provided inadequate staffing in an epilepsy monitoring unit sufficiently alleged willful and wanton conduct because it created "danger or risk" to patients' safety); *see also Estate of Goodwin v. Connell*, 376 F. Supp. 3d 1133 (D. Colo. 2019) (holding that allegations of the defendant's failure to investigate claims of child abuse and manipulation of the complaint filing system were sufficient to show willful and wanton conduct and a conscious disregard of a serious risk, without a showing that the defendant expected the drowning of the ten-year-old child).

16

Accordingly, we conclude that the district court applied an erroneous legal standard.

¶ 38    The deputies knew that Trey had consumed multiple controlled substances, as revealed by his behavior and the DRE. However, the DRE examiner did not conclude that Trey was in danger of an overdose. A conscious disregard of a danger of overdose would constitute willful and wanton conduct.

¶ 39    We agree with the district court that for the individual defendants, other than Deputy Phillips, their conduct as alleged did not constitute a conscious disregard of a danger that Trey had overdosed. There is no evidence that Trey requested medical assistance at the time he was arrested, and, although the deputies requested that he submit to a blood test, he refused. The facts do not demonstrate that Trey's behavior indicated he required medical attention until sometime after he was served breakfast — approximately sixteen hours after he was arrested. He was video-monitored during the first few hours of his confinement, and he was checked many times after he changed cells, even if some of the TCS entries are not supported by video evidence. At least through the time he was served breakfast, Trey was able to function

17

— walking, talking, eating, and sleeping. Although his movements were sluggish and uncoordinated, as one might expect from an intoxicated person, he never called for medical attention.

¶ 40    With respect to Deputy Phillips, however, plaintiffs have alleged some facts to support a finding of willful and wanton conduct. With record support, plaintiffs allege that when Phillips saw Trey that morning, he

- knew that Trey had been arrested in an intoxicated state over seventeen hours earlier;

- saw Trey in an odd position that caused concern to a trustee inmate familiar with Trey, and later caused Deputy Rupp enough concern that Rupp attempted to rouse him;

- was alerted to the concern by the trustee inmate; and

- walked away, saying, "That's what you get for doing drugs."

Although Phillips denies (or does not recall) making that statement to the trustee inmate, a review of the security videotape shows that they had a brief exchange after Phillips removed the tray from the

cell. In addition, Phillips may have seen spilled food on the floor of Trey's cell.

¶ 41 The district court did not address these specific allegations regarding Deputy Phillips in its order, and it did not make findings resolving the conflicting accounts of Deputy Phillips, Brandon Morse, and what appears in the video surveillance. Therefore, we cannot affirm its conclusion that there was no evidence showing willful and wanton conduct by defendant Phillips. We therefore remand this part of the case and direct the district court to conduct an evidentiary hearing pursuant to *Trinity* to determine whether it may exercise subject matter jurisdiction over plaintiffs' claim against Deputy Phillips.

## IV. Attorney Fees on Appeal

¶ 42 Defendants request attorney fees on appeal pursuant to section 13-17-201, C.R.S. 2019. The statute provides:

> In all actions brought as a result of . . . an injury to person or property occasioned by the tort of any other person, where any such action is dismissed on motion of the defendant prior to trial under rule 12(b) of the Colorado rules of civil procedure, such defendant shall have judgment for his reasonable attorney fees in defending the action.

19

¶ 43    Under this section, an award of attorney fees is mandatory when a trial court dismisses an action under C.R.C.P. 12(b). *Houdek v. Mobil Oil Corp.*, 879 P.2d 417 (Colo. App. 1994).  A wrongful death claim is a claim for "an injury to person or property occasioned by the tort of any other person."  *Id.* at 424.

¶ 44    Section 13-17-201 provides for an award of attorney fees where "the defendant" moves for and is granted pretrial dismissal under Rule 12.  Using "defendant" in the singular necessarily applies to each individual defendant against whom an entire action has been dismissed.  *See Smith v. Town of Snowmass Vill.*, 919 P.2d 868, 873 (Colo. App. 1996).  Because we have concluded that the district court properly dismissed plaintiffs' claims against the GCSO under C.R.C.P. 12(b)(5), and against the former Sheriff and all of the deputies other than Phillips under Rule 12(b)(1), we must award attorney fees for successfully defending an appeal of those dismissed claims.  *See Henderson v. City & Cty. of Denver*, 2012 COA 152, ¶ 57.  We remand to the district court to decide the amount of attorney fees.

V. Conclusion

20

¶ 45    We affirm the district court's dismissal of plaintiffs' case against defendant GCSO for failure to state a claim upon which relief can be granted, and against Sheriff Richard Besecker, Deputy Ian Clark, Deputy Paula Martinez, Deputy Conner Udell, Deputy Megan Hollenbeck, Deputy Chad Roberts, and Deputy Brandyn Rupp for lack of subject matter jurisdiction.

¶ 46    We reverse the district court's dismissal against Deputy Ryan Phillips and remand for further proceedings to resolve all remaining disputed factual issues and jurisdictional issues with respect to Deputy Phillips.  We also remand the determination of the amount of appellate attorney fees.

JUDGE DAILEY and JUDGE BROWN concur.